UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————

JESSICA S.,

                                        Plaintiff,

v.                                                              8:21-cv-00094-TWD


COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

———————————————————————————

APPEARANCES:                              OF COUNSEL:

MARK A. SCHNEIDER
*Counsel for Plaintiff*
Schneider & Palcsik
57 Court Street
Plattsburgh, NY 12901

U.S. SOCIAL SECURITY ADMIN.          KRISTINA D. COHN, ESQ.
*Counsel for Defendant*
Office of the General Counsel
6401 Security Boulevard
Baltimore, MD 21235

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND DECISION</u>

Plaintiff Jessica S. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (Dkt. No.

1.)  Plaintiff consented to the disposition of this case by a Magistrate Judge.  (Dkt. No. 5.)  Both

parties filed briefs, which the Court treats as motions under Federal Rule of Civil Procedure Rule

12(c) in accordance with General Order 18.  (Dkt. Nos. 13, 18.)  Oral argument was not heard.

For the reasons discussed below, Plaintiff's motion is denied, and Defendant's motion is granted. The Commissioner's decision is affirmed.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born in 1975. (Administrative Transcript at 43.[1]) She completed high school and has two Associates Degrees: one in nursing and one in business administration. (T. 44.) Plaintiff worked as an emergency room nurse from June 2004 to June 2011. (T. 46.) While on the job, a patient attacked her. (T. 54, 381.) As a result, Plaintiff suffered a back injury and could no longer work as a nurse. (T. 54.) Plaintiff worked at the Dollar Tree as an assistant manager from February 2015 to February 2018. (T. 45, 120, 285.) While at the Dollar Tree, Plaintiff performed the usual duties of an assistant manager in a retail store but would delegate any lifting heavier than a gallon of milk to other employees. (T. 45.) She had to stop working at the Dollar Tree due to seizures. (T. 578-79.)

Plaintiff has since been treated for lower back pain, shoulder pain, seizures, kidney stones, asthma, postural tachycardia syndrome ("POTS"), gastroesophageal reflux disease ("GERD"), ulcers, migraines, and neuropathy. (T. 283, 389-90, 392-93.) She also has a history of mental health treatment for anxiety, bipolar disorder, and substance abuse disorder. (T. 283, 1115-16, 1119-20, 1136-38.) Although recent treatment notes reflect improvement with psychiatric medication, Plaintiff testified she still experiences symptoms of anxiety and depression. (T. 54-57, 1111-13, 1115-17, 1119-21.)

On January 25, 2019, Plaintiff protectively filed an application for DIB alleging an onset

---

[1] The Administrative Transcript is found at Dkt. No. 10. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the numbers assigned by the Court's CM/ECF electronic filing system. Citations not made to the Administrative Transcript will use the page numbers assigned by the Court's CM/ECF electronic filing system.

date of February 1, 2018.  (T. 16, 239-40.)  Plaintiff's application was initially denied on May 8,

2019, and her request for administrative reconsideration was denied on July 22, 2019.  (T. 132-

143, 145-55.)  Thereafter, she filed a written request for a hearing, and a telephonic hearing was

held on April 3, 2020, before Administrative Law Judge ("ALJ") Brian LeCours.  (T. 16, 28, 37-

71, 159-61.)  Plaintiff and a vocational expert ("VE") testified at the hearing.  (T. 37-71.)  On

April 20, 2020, the ALJ issued a written decision finding Plaintiff was not disabled under the

Social Security Act.  (T. 16-28.)  On January 14, 2021, the Appeals Council denied Plaintiff's

request for review, making the ALJ's decision the final decision of the Commissioner.  (T. 1-7.)

Plaintiff commenced this action on January 27, 2021.  (Dkt. No. 1.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard for Benefits

In reviewing a final decision of the Commissioner, courts must first determine whether

the correct legal standards were applied, and if so, whether substantial evidence supports the

decision.  *Atwater v. Astrue*, 512 F. App'x 67, 69 (2d Cir. 2013) (citing *Tejada v. Apfel*, 167 F.3d

770, 773 (2d Cir. 1999)); *see also Brennan v. Colvin*, No. 13-CV-6338 (AJN) (RLE), 2015 WL

1402204, at *10 (S.D.N.Y. Mar. 25, 2015).[2]  "Failure to apply the correct legal standards is

grounds for reversal."  *Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004).  Accordingly, the

reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the proper

legal standards were applied.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

---

[2] "Since the standards for determination of disability and for judicial review in cases under 42 U.S.C. § 423 and 42 U.S.C. § 1382c(a)(3) are identical, decisions under these sections are cited interchangeably."  *Donato v. Sec'y of Dep't of Health & Hum. Servs. of U.S.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983).  Moreover, "[t]he regulations that govern the two programs are, for today's purposes, equivalent."  *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019).  Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted.  *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

If the ALJ applied the correct legal standards, the reviewing court must determine whether the ALJ's decision is supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Bowen*, 817 F.2d at 985. "Substantial evidence means more than a mere scintilla." *Sczepanski v. Saul*, 946 F.3d 152, 157 (2d Cir. 2020). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). If the ALJ's finding as to any fact is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g); *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

When inadequacies in the ALJ's decision frustrate meaningful review of the substantial evidence inquiry, remand may be appropriate. *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). Remand may accordingly be appropriate where the ALJ has failed to develop the record, *Klemens v. Berryhill*, 703 F. App'x 35, 38 (2d Cir. 2017); *Rosa v. Callahan*, 168 F.3d 72, 82 (2d Cir. 1999), adequately appraise the weight or persuasive value of witness testimony, *Estrella*, 925 F.3d at 98; *Burgess v. Astrue*, 537 F.3d 117, 130 (2d Cir. 2008), or explain his reasoning, *Klemens*, 703 F. App'x at 36-38; *Pratts*, 94 F.3d at 39.

### B.     Standards for ALJ Evaluation of Mental Health Listings

At step three of the sequential evaluation, the ALJ must determine whether the individual's severe impairment meets or equals the criteria of any impairment listed in Appendix 1 of the regulations ("listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(4)(iii), (d); *see* 20 C.F.R. § 404 Subpt. P, App. 1. If an individual's impairment, or combination of impairments, matches the requirements of the relevant listing, then the individual is disabled. *Id.* §§ 404.1520(d), 416.920(d). To meet a listing, the individual's impairment "must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter

4

how severely, does not qualify." *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990) (emphasis in original).

At issue are listings 12.04, 12.06, and 12.15.  Plaintiff has the burden of showing she meets the requirements of paragraphs A and B together, or the requirements of paragraph C. 20 C.F.R. § 404 Subpt. P, App. 1, 12.04, 12.06, and 12.15.  To meet the paragraph B criteria, the individual must demonstrate marked limitation in at least two of the following domains of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; or (4) adapting and managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B).  To meet the paragraph C criteria, the individual must present a "medically documented history of the existence of the disorder over a period of at least 2 years," with both "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder," and "marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.04(C), 12.06(C).

## C.    Standards for ALJ Evaluation of Opinion Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017,[3] and several of the prior Social Security Rulings ("SSR"), including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." *Revisions to Rules Regarding the Evaluation of*

---

[3] Plaintiff's application was dated January 28, 2019.  (T. 16, 239-40.)  Thus, the new regulations apply in this case.

*Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions."  *Id.* at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1).  The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" forming the foundation of the treating source rule.  *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion.  20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2).  With respect to "supportability," the new regulations provide "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1).  The regulations provide with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3).

## III.   THE ALJ'S DECISION

In his April 20, 2020, decision, the ALJ applied the five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. (T. 16-28.) First, he found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2019, and had not engaged in substantial gainful activity since the alleged onset date of February 1, 2018. (T. 18.) The ALJ next determined Plaintiff has the following severe impairments: "degenerative disc disease; positional orthostatic syndrome (POTS); seizure disorder; asthma; peripheral neuropathy; left shoulder impairment status-post surgery; depressive disorder; bipolar disorder; anxiety disorder; and substance abuse disorder." *Id.* He then determined Plaintiff does not have an impairment or combination of impairments meeting or medically equaling one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (T. 19.)

The ALJ next found Plaintiff has the residual functional capacity ("RFC") to perform light work with additional limitations. (T. 20-26.) Specifically, the ALJ found plaintiff

> can occasionally operate foot pedal controls; can occasionally
> balance, stoop, knee[l], crouch, crawl, and climb ramps or stairs;
> can never climb ladders, ropes, or scaffolds; can no more than
> occasionally be exposed to extremes of heat and cold and to
> pulmonary irritants such as fumes, odors, dust, and gases; must
> avoid hazardous conditions such as unprotected heights and
> dangerous machinery; can never drive; can perform unskilled

tasks, work that requires little or no judgment to do simple duties
that can be learned on the job in a short period of time; and
can perform work involving simple work-related decisions with
few workplace changes.

(T. 20.)  Relying on VE testimony, he found Plaintiff is unable to perform her past relevant

work.  (T. 26.)  Based upon her age, education, work experience, and RFC, the ALJ determined

Plaintiff was capable of performing other jobs existing in significant numbers in the national

economy.  (T. 26-27.)  Thus, the ALJ concluded Plaintiff has not been under a disability, as

defined in the Social Security Act, from February 1, 2018, through September 30, 2019, the date

last insured.  (T. 27.)

## IV.     THE PARTIES' CONTENTIONS

Plaintiff contends she is disabled under listings 12.04, 12.06, and 12.15 and the RFC is

not supported by substantial evidence.  (Dkt. No. 13 at 18-28.)  Defendant contends substantial

evidence supports the ALJ's evaluation of the medical opinion evidence regarding Plaintiff's

mental impairments; Plaintiff has failed to show she meets the paragraph B criteria for meeting

listings 12.04, 12.06, or 12.15; and substantial evidence supports the ALJ's physical RFC.  (Dkt.

No. 18 at 3-27.)

## V.      THE COURT'S ANALYSIS

### A.      Substantial Evidence Supports the ALJ's Determination that Plaintiff Did Not Meet a Mental Health Listing

At step three of the sequential analysis, the ALJ found Plaintiff's mental conditions did

not meet the criteria for listings 12.04 or 12.06.  (T. 19-20.)  In determining whether Plaintiff met

the paragraph B criteria, the ALJ concluded, based upon substantial evidence in the record, that

Plaintiff had a mild limitation in the domain of understanding, remembering, and applying

information; a mild limitation in interacting with others; a mild limitation in maintaining

concentration, persistence, or pace; and a moderate limitation in adapting or managing herself. *Id.*

First, substantial evidence supports the ALJ's finding of Plaintiff's mild limitation in the domain of understanding, remembering, and applying information.  On May 31, 2018, Plaintiff was examined by consultative examiner Dante Alexander, Psy.D.  (T. 811.)  At the exam, Plaintiff reported short-term memory deficits and concentration difficulties.  *Id.*  However, upon examination, Dr. Alexander found Plaintiff's recent and remote memory skills to be intact as she appropriately remembered 3 of 3 objects immediately and after a delay.  (T. 813.)  Plaintiff could also recite 5 digits forward and 3 digits backwards.  *Id.*  M. Momot-Baker, Ph.D., a State agency medical examiner, reviewed the available medical records and also determined Plaintiff had a mild limitation understanding, remembering, and applying information.  (T. 80, 84.)  S. Hennessey, Ph.D., another State agency medical examiner, similarly found Plaintiff had a mild limitation in this area.  (T. 96, 100.)  Moreover, on June 10, 2019, upon discharge from a hospitalization due to a seizure, Plaintiff's short, intermediate, and long-term memory were noted as "normal."  (T. 1220.)  At her November 8, 2019, examination with Physician Assistant James Vanness ("PA Vanness"), he noted Plaintiff's memory was "intact for recent and remote events" and she was "oriented to time, place and person."  (T. 1173.)  Finally, at her examination on January 30, 2020, she denied memory loss and Plaintiff's memory was reported to be "grossly intact."  (T. 1168.)

Second, substantial evidence supports the ALJ's finding of Plaintiff's mild limitation in interacting with others.  On April 4, 2019, Plaintiff was examined by consultative examiner, Brett T. Hartman, Psy.D.  (T. 578.)  While she reported being hypervigilant in public, Plaintiff also reported she had several good friends she sees regularly, and she gets along with family

members.  (T. 19, 579, 581.)  Dr. Hartman reported Plaintiff was cooperative and pleasant throughout the exam and her eye contact was appropriate.  (T. 580.)  Dr. Hartman concluded Plaintiff had mild difficulty interacting with others.  (T. 581.)  Upon review of the record, Dr. Momot-Baker determined Plaintiff was capable of relating to others in work interactions.  (T. 90.)  While he noted Plaintiff had social interaction limitations, her ability to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibit behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness were not significantly limited. (T. 89.)  Dr. Hennessey concluded the same.  (T. 106.)

Third, substantial evidence supports the ALJ's finding of Plaintiff's mild limitation in maintaining concentration, persistence, or pace.[4]  At her examination with Dr. Hartman, Plaintiff reported concentration difficulties and short-term memory deficits.  (T. 579.)  However, Dr. Hartman found Plaintiff's attention and concentration were only mildly impaired.  (T. 580.) Plaintiff could count without difficulty and performed fairly well with calculations, but lost track on serial 7s.  *Id.*  Similarly, Dr. Alexander found Plaintiff had a mild limitation in sustaining concentration and performing a task at a consistent pace.  (T. 814.)  Dr. Alexander also found Plaintiff's attention and concentration to be intact and her counting to be appropriate.  (T. 813.) Plaintiff could perform simple calculations and did serial 3s from 20 correctly but did serial 7s from 100 incorrectly.  *Id.*  Moreover, at her March 6, 2018, April 24, 2018, and May 23, 2018,

---

[4] The Court notes that in describing Plaintiff's limitations in maintaining concentration, persistence, or pace, the ALJ used both the terms "mild" and "moderate."  (T. 19, 20, 21.)  Dr. Hartman did the same.  (T. 580, 581.)  Although there are some differences between mild and moderate limitations, the Court finds the use of both terms is a harmless error as finding this limitation to be either mild or moderate does not affect the outcome of this matter.

exams at University of Vermont Health Network, her attention span and concentration were noted to be normal.  (T. 413, 423, 436.)  Dr. Momot-Baker also found Plaintiff's memory, attention, and concentration to be only mildly impaired.  (T. 586.)

Finally, substantial evidence supports the ALJ's finding of Plaintiff's moderate limitation in adapting or managing herself.  Plaintiff reported she could dress, bathe, and groom herself; cook, clean, and do laundry; do light housework; play video games; and cross-stitch.  (T. 20, 572-73, 581.)  At his exam with Plaintiff, Dr. Hartman noted Plaintiff was cooperative and pleasant, although her judgment was fair to poor.  (T. 580-81.)  Dr. Momot-Baker and Dr. Hennessey both determined Plaintiff had a moderate limitation in adapting and managing herself.  (T. 84, 100.)  Notably, when asked on a checkbox form if while under treatment and medication Plaintiff had any limitation adapting or managing herself, PA Vanness, Plaintiff's mental health provider, marked "no."  (T. 489.)

Therefore, substantial evidence supports the ALJ's paragraph B findings.  *See Beau M. v. Comm'r of Soc. Sec.*, No. 8:18-CV-1170 (ATB), 2020 WL 586868, at *5 (N.D.N.Y. Feb. 6, 2020) (finding substantial evidence consisting of plaintiff's testimony, intact daily activities, observations from his physicians, and consultative examination results supported ALJ's paragraph B analysis of no more than moderate limitation in any domain).

The ALJ also determined Plaintiff did not meet the paragraph C criteria, explaining her condition was not "serious and persistent" because she did not have a medically documented history of the existence of the disorder over a period of at least 2 years.  (T. 20.)  Moreover, there was not evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that was ongoing and that diminished the symptoms and signs of her mental disorder; and (2) marginal adjustment, that is, she did not

11

have minimal capacity to adapt to changes in the environment or to demands that were not already part of daily life. *Id.*

As the ALJ had pointed out in his paragraph B analysis, Plaintiff's treatment records showed she had largely normal examination findings, she lived independently, and she performed wide-ranging daily activities such as cooking, cleaning, doing laundry, going shopping, dressing herself daily, watching TV, reading, cross-stitching, playing video games, and socializing with friends. (T. 56, 90, 108, 572-73, 581, 813-14, 818.) While Plaintiff had received inpatient psychiatric hospitalization in the past, Plaintiff reported her mental health has improved and she now receives counseling and medication to manage her mental health. (T. 443, 445, 544-49, 551-53, 555-57, 559-61, 563-65, 567-69, 594, 811, 1111-13, 1115-17, 1119-21.)

Thus, the ALJ properly concluded that Plaintiff did not meet the paragraph C criteria. *See Jeffrey W. v. Berryhill,* No. 1:18-CV-0115 (LEK), 2019 WL 2210593, at *7-8 (N.D.N.Y. May 22, 2019) (finding plaintiff did not satisfy the paragraph C criteria with the requisite "marginal adjustment" where plaintiff's daily activities included managing money, playing poker, using his computer, driving a car, shopping, cooking, fishing, walking the dogs, cleaning his clothes, and vacuuming, and medical evidence indicated plaintiff's good concentration, intact memory, normal thought content, and goal oriented thought processes); *Mitchell v. Berryhill*, No. 16-CV-6588, 2018 WL 3300683, at *18 (S.D.N.Y. Feb. 2, 2018) (Rep't-Rec), *adopted sub nom.*, *Mitchell v. Colvin*, 2018 WL 1568972 (S.D.N.Y. Mar. 30, 2018) (finding claimant did not have marginal adjustment where claimant had interactions with family and friends at church, logical thoughts processes, intact judgment, good concentration, and could cook, clean, shop, and do laundry).

Plaintiff argues she meets listings 12.04, 12.06, and 12.15 based on the opinion of PA Vanness.  (Dkt. No. 13 at 23-25.)  However, Plaintiff has the burden of proof to explain how PA Vanness' opinions undermine the ALJ's determination that Plaintiff does not meet the listings, and she has not done so.  *Robert L. v. Saul*, 8:19-CV-415 (MAD), 2020 WL 1689886, at *10 (N.D.N.Y. Apr. 7, 2020).

Moreover, the ALJ correctly rejected these opinions insofar as they suggested any marked limitation in any of the paragraph B criteria.  (T. 25.)  Although PA Vanness found Plaintiff had marked limitations applying information and maintaining pace (T. 1313), this finding is inconsistent with his own records as he had previously noted Plaintiff had no symptoms of depression or anxiety and her mental status examinations were within normal limits.  (T. 1111-13, 1115-17, 1119-21.)  Notably, on September 23, 2019, Plaintiff reported to PA Vanness that she was "doing better now than in years."  (T. 1115.)

Plaintiff also argues her mental condition meets listing 12.15 for post-traumatic stress disorder ("PTSD").  (Dkt. No. 13 at 18, 25.)  However, the ALJ did not evaluate this listing because he did not find Plaintiff's PTSD was a medically determinable impairment.  (*See* T. 18.)  Plaintiff does not dispute the ALJ's conclusion that her PTSD was not a medically determinable impairment; as such, the Court finds Plaintiff has waived this argument.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* N.D.N.Y. General Order 18 at ¶ C (1) D ("The issues before the Court are limited to the issues properly raised in the briefs.").   Even if Plaintiff's PTSD were a medically determinable impairment and required a listing analysis, she fails to meet listing 12.15 since the record evidence supports the ALJ's findings that her other conditions did not meet the requirements for listings 12.04 and 12.06, which contain identical paragraph B and C criteria to listing 12.15.  *Compare* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.04(B), (C),

12.06(B), (C); *with* §§ 12.15(B), (C).  Accordingly, the Court finds no error in the ALJ's determination that Plaintiff did not meet any mental health listing.

### B.     Substantial Evidence Supports the ALJ's Physical RFC Determination

#### 1.     Legal Standards

A claimant's RFC is the most he or she can do despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45 52 (2d Cir. 1999)).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Id.* (citing 20 C.F.R. § 404.1545(a)).  "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'" *Hendrickson v. Astrue*, No. 11-CV-0927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting SSR 85-15, 1985 WL 56857, at *8).  The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

It is the province of the ALJ to resolve genuine conflicts in the record. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  However, the Commissioner need not "reconcile explicitly every shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 66 (2d Cir. 2008) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)).  Here, the ALJ resolved conflicts between the various medical opinions by assessing the supportability, consistency, and

persuasiveness of each and finding those portions most supported by and consistent with the record to be persuasive. (T. 20-26.) In doing so, the ALJ appropriately evaluated the conflicting medical evidence, and made an RFC finding consistent with the overall record. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all the evidence available to make an RFC finding consistent with the record as a whole). Considering the ALJ's detailed analysis of Plaintiff's medical history, the relevant medical opinions, Plaintiff's testimony, and her activities of daily living, this Court concludes the RFC determination was supported by substantial evidence, as summarized below.

### 2. The RFC's assessment and Plaintiff's argument

As set forth above, the ALJ found Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b) except she can only occasionally operate foot pedal controls; can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can no more than occasionally be exposed to extremes of heat and cold and to pulmonary irritants such as fumes, odors, dust, and gases; must avoid hazardous conditions such as unprotected heights and dangerous machinery; can never drive; can perform unskilled tasks, that is work that requires little or no judgment to do simple duties that can be learned on the job in a short period of time; and can perform work involving simple work-related decisions with few workplace changes. (T. 20.)

Plaintiff argues the ALJ erred as a matter of fact and law in finding Plaintiff could perform light work with additional limitations because he did not include limitations for her asthma, peripheral neuropathy, left shoulder rotator cuff tear status post-surgery, sleep disorder, status post gastric bypass, kidney stones, PTSD, and side effects from her medications. (Dkt.

No. 13 at 29.)

### 3.    Medical Opinions

In determining the Plaintiff's physical RFC, the ALJ reviewed all of Plaintiff's treatment records and determined the persuasiveness of the relevant medical opinions.  The ALJ found the opinions of State agency medical examiners, Dr. Rosenthal and Dr. Angelotti, to be persuasive. (T. 25.)  Dr. Rosenthal found Plaintiff's ability to balance was unlimited and she could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl. (T. 86-87.)  He also found Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and stand and/or walk and sit 6 hours out of an 8-hour workday.  (T. 86.) She had unlimited ability to push and/or pull other than shown for lifting and carrying.  *Id.*

Dr. Rosenthal's findings were supported by his review of the record.  He specifically added environmental limitations, noting Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation and avoid even moderate exposure to hazards such as machinery and heights due to Plaintiff's history of seizures and asthma.  (T. 87.)

Dr. Rosenthal included additional explanation for his RFC recommendation.  *Id.*  He noted Plaintiff alleged disability due to asthma, seizure disorder, tachycardia, back pain, and degenerative disc disease.  (T. 87.)  While Plaintiff alleged asthma, Dr. Rosenthal noted she has had no hospitalizations or ER visits for asthma within 5 years and she takes albuterol as needed. (T. 87, 381, 782.)  Her last seizure was December 15, 2018.  (T. 48-50, 87, 475-76, 1018.) Moreover, despite her history of opioid abuse, as of December 2018, the CT scan of her head and her labs were unremarkable.  (T. 87, 450-54, 476, 654, 1021, 1221, 1250-51.)  Her Electroencephalograms ("EEGs") and neurological exam were also normal with intact visual

fields, intact bilateral shoulder shrug, and 5/5 strength in her upper and lower extremities.  (T. 87, 480, 808, 836, 844-45, 849, 850, 852, 856.)  Plaintiff underwent left rotator cuff surgery in 2018.  (T. 87, 664.)  At her April 4, 2019, exam she had reduced range of motion in her left shoulder, but she had normal gait, stance, ambulation, and her chest and lungs were clear.  (T. 87, 573-74.)

Dr. Angelotti made similar findings regarding Plaintiff's abilities. (T. 103.)  He determined Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and avoid all exposure to hazards such as machinery and heights due Plaintiff's history of seizures and asthma.  (T. 104.)

Dr. Angelotti's findings were also supported by his review of the record.  He noted Plaintiff's asthma was stable.  (T. 104.)  She takes albuterol as needed and had not been hospitalized or to the ER due to asthma within the last 5 years.  (T. 104, 381, 782.)  Her last seizure was December 15, 2018, and her February 2019 head CT, EEG, brain MRI, and cervical spine MRI were all within normal limits except for minimal degenerative changes of the cervical spine.  (T. 48-50, 104, 475-76, 482-84, 1018.)  Plaintiff takes Keppra for her seizures.  (T. 49, 104, 381, 386.)  On March 22, 2019, she was diagnosed with focal seizures with secondary generalization, but her neurological exam was stable with no abnormalities.  (T. 104, 653-57.)  Regarding her history of POTS and vasovagal episodes, Dr. Angelloti noted at her May 24, 2019, cardiac visit, her EKG showed sinus bradycardia with normal intervals.  (T. 104, 657-61.)  She reported no syncope or presyncope but noted if she missed a dose of Midodrine or Florinef she would get lightheaded upon getting up quickly.  (T. 104, 657-58.)  Dr. Angelloti also accounted for Plaintiff's history of gastric bypass, ulcers, hernia repair, and kidney stones.  (T. 104, 382, 410, 496.)

On October 10, 2018, her primary care provider, Yamilee A. Jacques, MD, reported Plaintiff was doing well since her kidney stone removal.  (T. 104, 507.)  While Plaintiff reported nausea at her January 2019 primary care visit, she denied vomiting, abdominal pain, diarrhea, or constipation and her abdominal exam was within normal limits.  (T. 104, 384-85.)  After her left rotator cuff surgery, she had a decreased range of motion in her left shoulder.  (T. 104, 574.)  Plaintiff also receives pain management for her low back pain.  (T. 105, 1086.)  At her January 2019 visit she had lumbar spine flexion of 80 degrees, her gait was normal, and she had tenderness on the paraspinal region.  (T. 105, 644-45, 1086.)  She received a lumbar spine injection in March 2019.  (T. 105, 646.)  Her April 4, 2019, x-ray showed mild disc space narrowing at L4/L5 and L5/S1 as well as lumbar facet arthrosis.  (T. 105, 576.)  At her exam on the same day, her gait, stance, and ambulation were normal.  (T. 105, 573.)  Her lumbar spine had a full range of motion and she had full strength in her upper and lower extremities.  (T. 105, 574.)  She reported numbness in the fourth and fifth toes on her right foot, the lateral aspect of the right lower leg, and her right thigh laterally.  *Id.*

The ALJ found Dr. Rosenthal and Dr. Angelotti's opinions were supported by Dr. Wassef's opinion.  (T. 25.)  At the May 30, 2018, exam with Dr. Wassef, Plaintiff's cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (T. 819.)  She did not have scoliosis, kyphosis, or abnormality in the thoracic spine. *Id.*  She had full range of motion in her bilateral shoulders, elbows, forearms, wrists, hips, knees, and ankles.  *Id.*  There were no evident subluxations, contractures, ankylosis, or thickening.  *Id.*  Her joints were stable and nontender and there was no redness, heat, swelling or effusion.  *Id.*  Her extremities showed no signs of cyanosis, clubbing, or edema and the pulses were physiologic and equal.  (T. 820.)  There was no significant varicosities or trophic changes and no

muscle atrophy.  *Id.*  Her hand and finger dexterity were intact and her grip strength was 5/5 bilaterally.  *Id.*

Based on his exam, Dr. Wassef found Plaintiff should not be exposed to extremes in temperature, second-hand smoke, perfumes, chemicals, or any type of respiratory irritants.  (T. 820.)  He also opined Plaintiff should not drive cars or trucks, should not operate heavy machines, should not do any high-altitude activity, and should not be diving or swimming.  *Id.* He concluded "otherwise, I was not able to detect other physical limitations."  *Id.*

Dr. Wassef again examined Plaintiff on April 4, 2019.  (T. 571.)  He made essentially the same findings except he noted Plaintiff's left shoulder had forward elevation to 100 degrees, abduction to 100 degrees, adduction to 30 degrees, interior rotation to 40 degrees, and exterior rotation to 90 degrees.  (T. 574.)  During the exam, Plaintiff appeared to be in no acute distress. (T. 573.)  Her gait and stance were normal and she could walk on her heels and toes without difficulty but she was unable to squat.  *Id.*  She did not use any assistive devices; did not need any help changing for the exam or getting on and off the exam table; and she was able to rise from the chair without difficulty.  *Id.*  She reported to Dr. Wassef that she cooked and cleaned 5 times a week.  (T. 572.)  She claimed she could not do laundry because she could not carry it.  *Id.* While she went shopping once a week, she could not drive.  *Id.*  She also reported she was able to dress and bathe herself every day.  *Id.*

In addition to the limitations Dr. Wassef noted in his previous exam, he opined at the April 4, 2019, exam, Plaintiff had moderate limitations with regard to standing, walking, climbing, descending stairs, bending, squatting, lifting, sitting, operating foot controls, pushing, pulling, and handling.  (T. 575.)  The ALJ found this portion of the opinion to be less supported by his examination of the Plaintiff as she had full strength in her upper and lower extremities.

(T. 25, 574.)

Finally, the ALJ found PA Vanness's opinion regarding Plaintiff's reduced physical function not to be persuasive because he does not treat Plaintiff for any physical impairments. (T. 25, 537, 1111-13, 1115-17, 1119-21.)

The Court, in reviewing the medical opinions and the ALJ's treatment of the opinions, finds the ALJ properly addressed the "most important" factors of consistency and supportability regarding the opinions of Dr. Rosenthal, Dr. Angelotti, Dr. Wassef, and PA Vanness. *See* 20 C.F.R. §§ 404.1520c(c)(3), (4); 416.920c(c)(3), (4). Regarding consistency, the ALJ pointed out that Dr. Rosenthal and Dr. Angelotti's opinions were consistent with their thorough review of the record. (T. 25.) He further found their opinions were supported by the opinions of Dr. Wassef. *Id.* However, he found that Dr. Wassef's finding of Plaintiff's moderate limitation walking, climbing, bending, squatting, lifting, sitting, operating foot controls, pushing and pulling to be less supported by his own examination where Plaintiff showed full strength in her upper and lower extremities. *Id.* Moreover, the ALJ found PA Vanness' opinion regarding Plaintiff's physical function was not persuasive because he did not treat Plaintiff for any physical impairments. (T. 25, 537, 1111-13, 1115-17, 1119-21.)

In short, the Court finds the ALJ correctly evaluated the opinion evidence of record and considered it along with all the evidence such that substantial evidence supports the ALJ's decision. The ALJ properly relied on all the evidence including Dr. Rosenthal and Dr. Angelotti's opinions which were thoroughly supported by the record, Dr. Wassef's mostly unremarkable clinical examination findings, and Plaintiff's various activities of daily living. (T. 25, 86-87, 103-05, 571-74, 819-20.)

### 4.     The ALJ included limitations related to Plaintiff's epilepsy and POTS

Plaintiff argues she cannot perform light work in part due to her epilepsy and POTS and the ALJ erred by not including limitations related to these impairments into her RFC.  (Dkt. No. 13 at 27.)  However, it appears the ALJ did take Plaintiff's epilepsy and POTS into account when determining to the RFC.  The ALJ considered the opinions of Dr. Rosenthal and Dr. Angelotti in finding Plaintiff could perform light work.  (T. 21.)  Dr. Rosenthal specifically included environmental limitations "due to history of seizures and asthma" including avoiding concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation and avoiding even moderate exposure to hazards such as machinery and heights.  (T. 87.)

Dr. Angelotti also assigned environmental limitations due to Plaintiff's history of seizures and asthma including avoiding concentrated exposure to fumes, odors, dusts, gases, and poor ventilation and avoiding all exposure to hazards such as machinery and heights.  (T. 104.)  Dr. Angelotti noted Plaintiff's asthma was stable as she had not been to the hospital or ER for asthma within 5 years, she took albuterol as needed, and her chest and lungs were clear at her consultative exam.  (T. 48-50, 104, 475-76, 1018.)  He also noted Plaintiff's last seizure was December 15, 2018, her head CT and brain MRI were normal, her March 22, 2019, neurological exam was stable with no abnormalities, and Plaintiff took Keppra for the seizures.  (T. 48-50, 104, 381, 386, 475-76, 482-84, 1018.)  Dr. Angelotti further noted while Plaintiff had a history of POTS and vasovagal episodes; her May 24, 2019, EKG was within normal limits; Plaintiff did not report syncope or presyncope; and reported if she missed a dose of her Midodrine or Florinef she would get lightheaded if she got up quickly.  (T. 104, 657-61.)  Given these findings, Dr. Angelotti concluded Plaintiff was capable of the above RFC.  (T. 105.)

The ALJ found the opinion of consultative examiner Dr. Wassef, supported the opinions of Dr. Rosenthal and Dr. Angelotti.  (T. 25.)  Based on his examination, Dr. Wassef determined Plaintiff should not drive cars or trucks, operate heavy machinery, perform high altitude activity, or dive or swim.  (T. 575.)  He also determined Plaintiff should not be exposed to extremes in temperatures, secondhand smoke, perfumes, chemicals, or any type of respiratory irritants.  *Id.* Finally, he concluded Plaintiff had moderate limitations standing, walking, climbing, descending stairs, bending, squatting, lifting, sitting, operating foot controls, pushing, pulling, and handling. *Id.*

However, even if the ALJ had not included these RFC limitations, Plaintiff has failed to show these impairments require greater limitations than those already included in the RFC.  *See Oakes v. Colvin*, No. 5:13-cv-1374 (LEK/TWD), 2015 WL 1959681, at *6 (N.D.N.Y. Apr. 29, 2015) ("Plaintiff has failed to satisfy his burden of proving that his migraines resulted in any greater limitations than those already included in the ALJ's RFC finding.").

### 5.    Plaintiff has failed to show the RFC should include additional limitations due to her back and buttock pain

Plaintiff argues she "credibly testified [to] her limitations caused by her back and buttocks pain" and has limitations standing and walking due to this pain.  (Dkt. No. 13 at 28.) Plaintiff suffered injuries to her back when she was attacked by a patient while she was working as a nurse.  (Dkt. No. 13 at 28.)  She has since been treated by Bobby Oommen, MD, a pain management doctor, for pain via injections and medications.  (Dkt. No. 13 at 28; T. 646.) Moreover, Plaintiff notes the x-ray taken by Dr. Wassef showed "severe disc space narrowing at L5-S1"[5] and he determined she had moderate limitations standing, walking, climbing stairs,

---

[5] While it is unclear which x-ray taken by Dr. Wassef Plaintiff references, the Court notes the x-ray taken on May 31, 2018, describes "marked disc narrowing at L5-S1" and the x-ray taken on

descending stairs, bending, squatting, lifting, sitting, operating foot controls, pushing, pulling and handling.  (Dkt. No. 13 at 28-29; *see also* T. 575, 576, 822.)  Plaintiff argues since Dr. Wassef found moderate limitations in these areas, Plaintiff could only occasionally perform those functions.  (Dkt. No. 13 at 29.)  Therefore, according to Plaintiff, "Dr. Wassef's opinion, based upon his own examination, does not support a conclusion that [Plaintiff] could perform even sedentary work on a full-time, sustained basis.  *Id.*

Despite Plaintiff's contention she "credibly testified" regarding her symptoms, the ALJ determined Plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (T. 24.)  Because Plaintiff did not directly challenge the ALJ's finding regarding her subjective symptoms, the Court deems the argument waived.  *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal"); *Snyder v. Colvin*, No. 1:16-CV-0046 (LEK), 2017 WL 61946, at *6 n.1 (N.D.N.Y. Jan. 5, 2017) (finding an issue is waived where plaintiff failed to raise the claim in her brief).

Even withstanding Plaintiff's waiver, for the reasons set forth in the Commissioner's brief, Plaintiff has failed to demonstrate additional limitations with regards to her buttocks and back pain.  (Dkt. No. 18 at 19-23.)  To these reasons, the Court adds the following.  Plaintiff has reported pain in her right buttock and has been receiving injections for the pain since at least 2017 through at least 2019.  (T. 646, 739, 741-42.)  On April 5, 2018, Plaintiff had a follow-up exam regarding pain in her right buttock and reported it was "quite painful for her to sit and move." (T. 634.)  There was pain to palpation across the right buttock, but the range of motion

---

April 4, 2019, describes "mild disc space narrowing at L4/L5 and L5/S1." (T. 576, 822.)

was full with pain.  *Id.*  She did not appear in acute distress.  *Id.*  At her May 31, 2018, exam with Dr. Wassef, Plaintiff again appeared in no acute distress, her gait was normal, she could walk on heels and toes without difficulty, she could squat fully, her stance was normal, she did not need to use any assistive devices, did not need any help changing for the exam or getting on and off the exam table, and she was able to rise from her chair without difficulty.  (T. 818-19.)  Dr. Wassef noted the same at his April 4, 2019, exam except Plaintiff was unable to squat.  (T. 573.)  He noted she had full strength in her upper and lower extremities and had full range of motion of bilateral hips and knees.  (T. 574.)  On January 16, 2019, she reported she had "good relief" from the injection she received 8 months prior and was prescribed another injection.  (T. 365.)

On October 15, 2018, Plaintiff reported lower back pain which was about a 4-5/10.  (T. 367.)  She reported her pain was "under control" with her medications.  (T. 367-68.)  On November 1, 2018, she reported her lower back pain had "improved."  (T. 515.)  On April 4, 2019, Dr. Wassef diagnosed Plaintiff with lower back pain.  (T. 575.)  However, her cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (T. 574.)  There was no scoliosis, kyphosis, or abnormality in her thoracic spine.  *Id.*  She did not appear to be in acute distress; her gait was normal; she could walk on her heels and toes without difficulty; her stance was normal; she did not need to use any assistive devices; did not need any help changing for the exam or getting on and off the exam table; and she was able to rise from her chair without difficulty.  (T. 573.)  Given the medical records, the Court finds Plaintiff has failed to demonstrate additional limitations are warranted due to her back and buttock pain.

> **6.  Plaintiff has failed to demonstrate additional limitations are warranted for her asthma, peripheral neuropathy, left shoulder rotator cuff tear status post-surgery, sleep disorder, status post gastric bypass, kidney stones, PTSD, and side effects from medications**

Plaintiff also argues her other documented impairments including asthma, peripheral neuropathy, left shoulder rotator cuff tear status post-surgery, sleep disorder, status post gastric bypass, kidney stones, and side effects from her medications have "caused her to suffer from exertional and non-exertional limitations, including, but not limited to, being off task and missing work."  (Dkt. No. 13 at 29-30.)

Plaintiff's argument is scarce as best.  She does not provide any evidence or refer to medical records that would demonstrate these impairments warrant additional limitations to her RFC.  (Dkt. No. at 13 at 29-30.)  Because Plaintiff has not sufficiently argued that additional limitations are warranted due to these impairments, the Court deems the argument waived. *Snyder v. Colvin*, 667 F. App'x 319, 320 (2d Cir. 2016) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.") (quoting *City of Syracuse v. Onondaga Cty.*, 464 F.3d 297, 308 (2d Cir. 2006).)

Notwithstanding Plaintiff's waiver, for the reasons set forth in the Commissioner's brief, Plaintiff has failed to demonstrate additional limitations with regard to the above conditions. (Dkt. No. 18 at 23-28.)  To these reasons the Court adds the following.

### a.  Asthma

As noted above, the ALJ took Plaintiff's asthma into account when forming the RFC. *See supra* V.B.4.

### b.  Peripheral Neuropathy

The ALJ found Plaintiff's peripheral neuropathy was a severe impairment but determined there was limited medical evidence suggesting the degree of limitation alleged by Plaintiff.  (T.

18, 21.)  Dr. Angelotti noted Plaintiff's reported neuropathy in his RFC assessment but still opined Plaintiff could perform work functions consistent with the RFC.  (T. 104-05.)

Plaintiff has not consistently reported neuropathy symptoms to her medical providers. Upon her hospitalization at the University of Vermont after a seizure episode on February 27, 2018, she denied focal weakness and numbness.  (T. 877.)  On March 6, 2018, Plaintiff denied headaches, disturbances in coordination, numbness, falling down, and tingling.  (T. 435.)  On April 24, 2018, Plaintiff denied headaches, numbness, and falling down.  (T. 422.)  On May 23, 2018, Plaintiff denied numbness, tingling, and weakness.  (T. 412.)  On June 13, 2018, Plaintiff again denied numbness and tingling.  (T. 407.)  On April 4, 2019, Plaintiff reported numbness in her fourth and fifth toes on her right food, the lateral aspect of her right lower leg, and lateral aspect of her right thigh to Dr. Wassef.  (T. 571-72.)  However, despite her reported numbness in her lower extremities, her gait was normal; she could walk on her heels and toes without difficulty; her stance was normal; she did not use assistive devices; she did not need help changing for her exam or getting on and off the exam table; and she was able to rise from the chair without difficulty.  (T. 573.)  Plaintiff told Dr. Wassef she cooks and cleans 5 times a week, goes shopping once a week, and can bathe and dress herself daily.  (T. 572.)  She also had full strength in her upper and lower extremities.  (T. 574.)  On April 24, 2018, Plaintiff again denied headaches, numbness, and falling down.  (T. 787.)

Plaintiff has also exhibited mostly normal findings on examinations.  On February 27, 2018, during hospitalization following a seizure, her motor power appeared to be "5/5 in upper and lower extremities."  (T. 750.)  On March 20, 2018, her motor and sensory skills were "grossly normal bilaterally," she had normal muscle tone, no tremors, and her strength was 5/5. (T. 531.)  On June 14, 2019, following hospitalization for a seizure, upon examination Plaintiff's

motor exam showed normal bulk and tone throughout for age with no myoclonus, abnormal movements, or pronator drift. (T. 836.) Her gross touch, proprioception, and vibration sense were all intact. *Id.* Her deep tendon reflexes were equal and positive in all areas tested and Babinski and Hoffman's signs were negative bilaterally. *Id.* Her Romberg was negative; her toe and heel walking was normal; she was able to walk in tandem gait; and she was able to perform a single leg hop. *Id.* Therefore, Plaintiff has failed to show greater limitations are warranted due to her peripheral neuropathy.

### c.  Left shoulder rotator cuff

The ALJ found Plaintiff's left shoulder impairment to be severe but found limited medical evidence suggesting the limitation alleged by Plaintiff. (T. 18, 21.) Both Dr. Rosenthal and Dr. Angelotti took into account Plaintiff's left shoulder rotator cuff surgery when forming their opinions as to her RFC. (T. 87, 104.) Both found Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and had no limitations pushing and pulling other than shown for lifting and carrying. (T. 86, 103.) Dr. Wassef noted at the April 4, 2019, exam that Plaintiff had undergone rotator cuff repair and reported "it seems to be better at present." (T. 572.) On June 3, 2019, about six months after her shoulder surgery, A. Michael Imobersteg, MD, orthopedist, noted Plaintiff was doing well; had a full range of motion; and was comfortable with no complaints. (T. 664.) Therefore, Plaintiff has not demonstrated her left shoulder impairment warrants additional limitations than the RFC provides.

### d.  Sleep Disorder

Plaintiff reported she takes Ambien to sleep. (T. 55.) She testified she only sleeps 6 hours a night and frequently wakes up at 3 or 3:30AM. (T. 55-56.) On February 26, 2018, Plaintiff denied having a sleep disorder and reported she did not have trouble falling or staying

asleep. (T. 439-40.) On January 28, 2019, Plaintiff reported feelings of mania to PA Vanness which caused poor sleep and decreased her need for sleep. (T. 555.) By February 11, 2019, her sleep had improved and her mania was better. (T. 559.) On April 18, 2019, Plaintiff reported she was sleeping 14 hours a day and she presented with symptoms of anxiety and depression. (T. 611.) On May 6, 2019, her sleep had improved again and on June 6, 2019, she reported her sleep was "ok." (T. 619, 625.) Plaintiff underwent an EEG on February 28, 2018, which came back as normal and Plaintiff was reported to readily achieve N2 sleep with frequent arousals. (T. 762.) The provider noted the frequent arousals may reflect a sleep disorder, but did not expand on that statement. *Id.* She underwent multiple EEGs in June 2019 which were normal. (T. 849, 850, 852, 856.) On June 13, 2019, the EEG was "mildly abnormal" and on June 16, 2019, she suffered a seizure during the EEG. (T. 856, 858-59.) On September 23, 2019, Plaintiff reported her sleep was getting "less and less," but claimed she was "doing better now than in years." (T. 1115.) Given the evidence in the record, Plaintiff has failed to show greater limitations are warranted due to her sleep problems.

### e. Status Post Gastric Bypass

Plaintiff underwent a gastric bypass in July 2016. (T. 389.) On May 18, 2018, Plaintiff presented to Dr. Jacques with abdominal pain. (T. 415-18.) Dr. Jacques noted she suspected a viral gastroenteritis in etiology but there was a concern for possible gastritis. (T. 418.) On May 23, 2018, Plaintiff again presented to Dr. Jacques with abdominal pain, nausea, fatigue, and decreased appetite. (T. 410.) She reported having chronic diarrhea since her bypass surgery. *Id.* Dr. Jacques noted her symptoms might be suggestive of post-gastric bypass iron deficiency and anemia. (T. 414.) Plaintiff underwent a hernia repair on July 6, 2018, and it was discovered she also had an ulcer. (T. 382, 395.) On August 6, 2018, Dr. Jacques noted Plaintiff's abdominal

pain was "[e]ssentially resolved after hernia repair." (T. 398.) On January 18, 2019, Plaintiff

denied vomiting, abdominal pain, diarrhea, and constipation. (T. 498.) Thus, Plaintiff has not

shown her status post gastric bypass warrants more limitations than the RFC provides.

### f.  Kidney Stones

Plaintiff had a left kidney stone removed on October 5, 2018. (T. 388.) She had

previously had kidney stones at the age of 18. (T. 786.) She reported the summer of 2018 was

difficult for her due to her hernia repair and developing a kidney stone. (T. 1247.) While a renal

ultrasound demonstrated a persistent 3 mm left lower pole calculus without hydronephrosis,

Plaintiff was "totally asymptomatic." (T. 1291.) On January 28, 2019, she discussed the

possibility of potassium citrate therapy for her kidney stones with Dr. Oommen. (T. 1305.)

However, because Plaintiff only experienced one stone in 25 years, Plaintiff and Dr. Oommen

agreed it was not necessary at the time. *Id.* They scheduled a follow-up in May 2019 and if the

3 mm left kidney stone became larger, Dr. Oommen would recommend potassium citrate

therapy. *Id.* As of May 29, 2019, Plaintiff was still "totally asymptomatic." (T. 1301.) Thus,

Plaintiff has not shown her kidney stones warrant more limitation than the RFC provides.

### g.  PTSD

Plaintiff testified she has PTSD and is treated by PA Vanness with medication and talk

therapy. (T. 54-55.) Plaintiff takes Prozac for her PTSD. (T. 286.) Plaintiff testified she has

nightmares and flashbacks due to the PTSD. (T. 57.) She gets triggered when people get

combative with each other in front of her. *Id.* Moreover, Dr. Wassef diagnosed Plaintiff with

PTSD at her May 31, 2018, exam. (T. 820.) Plaintiff reported to Dr. Hartman on April 4, 2019,

she has frequent flashbacks, nightmares, night sweats, and is hypervigilant in public. (T. 579.)

She further reported she startles easily, is quick to anger outbursts, has a high degree of

apprehension and worry, and has a panic attack about once a month.  *Id.*  However, the ALJ, Dr. Momot-Baker, and Dr. Hennessey did not find Plaintiff's PTSD to be a severe impairment.  (T. 18, 79-84, 94-100.)  Due to the limited medical records and evidence, Plaintiff has not demonstrated her PTSD warrants more limitations than the RFC provides.

### h.  Side effects from medications

Plaintiff testified "a lot of" her medications make her "kind of drowsy and groggy."  (T. 58.)  At her March 6, 2018, exam she reported she felt "a bit fatigued" on Keppra but "denie[d] any other side effects."  (T. 433.)  When asked on a checkbox form if any of Plaintiff's mental health medications have side effects which would limit the Plaintiff's ability to function normally and productively, PA Vanness checked the "no" box.  (T. 487.)  PA Vanness noted on November 29, 2018, Plaintiff had discontinued Effexor due to the side effects.  (T. 546.)  However, on December 27, 2018, PA Vanness noted Plaintiff's behavior was stable and uneventful; her medication compliance was "good"; and "[n]o side effects are reported or in evidence."  (T. 551.)  He reported the same on February 11, 2019, February 25, 2019, March 26, 2019, April 18, 2019, April 26, 2019, May 6, 2019, June 6, 2019, July 24, 2019, September 23, 2019, October 9, 2019, November 8, 2019, and February 4, 2020.  (T. 559, 563, 567, 611, 615, 619, 625, 1111, 1115, 1119, 1173, 1176.)  Thus, Plaintiff has not demonstrated the side effects of her medications warrant more limitations than the RFC provides.

## VI.   CONCLUSION

Considering the foregoing, the Court finds the ALJ applied the correct legal standards and substantial evidence supports his decision.  Remand is therefore not warranted.

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 13) is **DENIED**; and it is further

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 18) is **GRANTED**; and it is further

**ORDERED** that the Commissioner's decision denying Plaintiff benefits is **AFFIRMED**; and it is further

**ORDERED** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED** and the Clerk of Court is directed to enter judgment and close the case.

Dated: March 28, 2023
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge